**ALLSTATE INSURANCE COMPANY**

v.

**Diana Lynn TARRANT et al.**

Supreme Court of Tennessee.

March 26, 2012.

David Lyle Franklin, Chattanooga, Tennessee, for the appellant, Allstate Insurance Company.

Charles S. Sexton, Sevierville, Tennessee, for the appellees, John Tarrant, Diana Lynn Tarrant, and Blue Ribbon Cleaning, Inc.

Billy J. Stokes, Jon M. Cope, and Hudson T. Ellis, Knoxville, Tennessee, for the appellee, Charles E. Leatherwood.

## OPINION

SHARON G. LEE., J, delivered the opinion of the Court, in which JANICE M. HOLDER AND GARY R. WADE, JJ., joined. WILLIAM C. KOCH, JR., J., filed a dissenting opinion, in which CORNELIA A. CLARK, C.J., joined.

After an automobile accident between the insured's van and a motorcycle, the insurer filed a declaratory judgment action to determine whether the van was covered under a commercial policy with a liability limit of $500,000 or a personal policy with liability limits of $100,000 per person and $300,000 per accident. The insurer alleged that before the accident the insured had instructed his insurance agent to transfer the van from the commercial policy to the personal policy. The insured denied this and alleged that he had instructed the agent to retain the van on the commercial policy. The trial court ruled that because the insurer had sent the insured a letter and premium bills showing the change in coverage and the insured had paid the bills without objection, he had ratified the transfer and the van was covered under the personal policy. The Court of Appeals reversed. We hold that the action of the insurance agent in transferring the van to the personal policy was not subject to ratification by the insured because the insurance agent was not acting in the insured's stead or for his benefit when it made the transfer. We further hold that the insurer

is estopped from denying coverage under the commercial policy. We affirm the judgment of the Court of Appeals, although on different grounds.

## I.

On June 17, 2005, Charles E. Leatherwood was allegedly injured when the motorcycle he was driving collided with a 2002 Chrysler Town & Country van ("the van") driven by Diana Lynn Tarrant. At the time of the accident, the van was leased from Huntington Bank and registered to Blue Ribbon Cleaning, Inc. ("Blue Ribbon"), a cleaning business operated and solely owned by Mrs. Tarrant and her husband, John Tarrant. Mr. Leatherwood subsequently filed suit against the Tarrants, alleging that the accident was caused by Mrs. Tarrant's negligence and seeking compensation for personal injury and property damage.

After the negligence lawsuit was filed against the Tarrants, a dispute arose between the Tarrants and their vehicle insurer, Allstate Insurance Company ("Allstate"), as to the amount of liability insurance coverage that was available on the van. Allstate's position was that the van was covered under a personal policy with liability limits of $100,000 per person and $300,000 per accident; the Tarrants maintained that the van was covered under a commercial policy with liability limits of $500,000. In October 2008, Allstate filed a declaratory judgment action[1] seeking a ruling that the van was covered under the personal policy and therefore subject to the lower liability coverage of $100,000/$300,000. The complaint alleged that in March 2005, before the accident, Mr. Tarrant requested that his Allstate agent, the Lonnie Jones Agency ("the Jones Agen-

cy") in Knoxville, move the van from the commercial policy to the personal policy because he wanted to save money on premiums and that, accordingly, the Jones Agency moved the van and two other vehicles from the commercial policy to the personal policy. In their answer, the Tarrants and Blue Ribbon denied that Mr. Tarrant directed the Jones Agency to move the van to the personal policy, alleged that the transfer to the personal policy was the Jones Agency's mistake, and requested a declaratory judgment that at the time of the accident the van was covered under the commercial policy.

At the trial on the complaint for declaratory judgment, the trial court heard the testimony of Lonnie Jones, owner of the Jones Agency; Patricia Smith, an insurance producer employed by the Jones Agency; Kathleen Collard, an Allstate field support representative; and Mr. Tarrant.

Mr. Jones testified that the Tarrants have been clients of the Jones Agency since 1990. He stated that Mr. Tarrant usually called him each year before renewing his commercial policy in an attempt to lower his premium payments. "[H]e's very watchful of his money and he calls me yearly particularly on his commercial and he gives me this direction, now, Lonnie, if you can't beat this, I'm going to leave you." Mr. Jones testified that a vehicle's usage determines whether it should be insured under a commercial policy or a personal policy. He admitted that the Jones Agency was aware that the van was leased in the name of Blue Ribbon and, therefore, it should have been on the commercial policy. However, he also stated that the van would have been moved from

1. Allstate sued the Tarrants and Blue Ribbon, as well as Tennessee Farmers Mutual Insurance Company, as subrogee of Charles Leath-

erwood, and United States Liability Insurance Company, as liability carrier for Blue Ribbon.

the commercial policy to the personal policy "just if [Mr. Tarrant] asked.... We take the directive of the insured to do that." While Mr. Jones did not recall any conversation with Mr. Tarrant in Spring of 2005, when Mr. Tarrant allegedly requested that the van be moved to the personal policy, Mr. Jones testified that if Mr. Tarrant called him at that time, he would have referred Mr. Tarrant to Patricia Smith, one of the agents employed at the Jones Agency.

Ms. Smith is a licensed insurance agent or insurance producer[2] and had been employed at the Jones Agency since March of 2004. She admitted that she did not recall her conversation with Mr. Tarrant or any of the changes that she made to the policies in March of 2005, and she retained no notes of her conversation with Mr. Tarrant. Her testimony was based on her usual practice—"I know how I do my job"—and on her review of policy billing histories and computer records she generated when she made the policy changes, none of which contain any information as to the discussion that transpired between herself and Mr. Tarrant or what his instructions to her were as to coverage. Based on computer printouts generated by the Jones Agency, she testified that when the van was originally leased in 2002, it was insured by itself under a commercial policy. Beginning in April of 2003, the van was insured under a discounted commercial fleet policy, along with a 1995 Lexus ES–300, a 2001 Econoline van, a 1998 Dodge Ram van, a 1984 Dodge Ram wagon, and subsequently, a 2003 DR–3500 Dodge truck. At the time of Mr. Tarrant's call, Allstate also insured a 1993 BMW 325 I and a 2000 Spinker camper under the personal policy. Ms. Smith stated that when she spoke with Mr. Tarrant, the commercial policy was due for renewal in

early April of 2005 and that he was concerned with obtaining a lower premium. She stated that at Mr. Tarrant's request, she moved the van, the Lexus, and the Dodge truck from the commercial policy to the personal policy and moved the BMW to a separate personal policy in the name of Mr. Tarrant's son.

Ms. Smith testified that in her conversation with Mr. Tarrant about transferring the three vehicles to the personal policy, she "would have discussed that he was using [these vehicles] in a personal manner. That would have been one of the things that would have prompted me, usage." Referencing an event history showing information that she entered into the Jones Agency's computer on March 23, 2005, Ms. Smith noted that the movement of the van and the other two vehicles to the personal policy was processed on that date, with an effective date of April 4, 2005. She admitted that at the time she made the coverage changes, the Jones Agency's records incorrectly showed Mr. Tarrant as the van's registered owner and did not show that the van was leased from Huntington Bank and was registered in the name of Blue Ribbon. In her prior deposition testimony, Ms. Smith stated that it would not have been appropriate to put the van on a personal policy if it was owned or leased by Blue Ribbon and that a company-owned vehicle should never be on a personal policy. At trial, when questioned about moving a vehicle registered to a commercial entity to a personal policy, Ms. Smith stated, "At that time I would figure that Mr. John Tarrant has an insurable interest in that vehicle and the fact that he's going to use it as a pleasure vehicle or personal vehicle, okay. And that he wanted me to do these things, that's what prompted me to do them."

**2.** " 'Insurance producer' means a person required to be licensed under the laws of this state to sell, solicit or negotiate insurance[.]" Tenn.Code Ann. § 56–6–102(6) (2008).

Ms. Smith said that had she known that Blue Ribbon owned the van it would have been her practice to advise Mr. Tarrant to have it titled in his name, although she does not remember whether she did so in this instance. Ms. Smith testified that she would not have moved the van to the personal policy unless Mr. Tarrant had requested the transfer. Although she stated that he requested the transfer, she admitted that she had no personal recollection of such a conversation. Ms. Smith did not testify that she moved the van to the personal policy because of a misunderstanding or confusion over the meaning of the word "van."

Ms. Collard, an Allstate field representative from Allstate's national support center in Roanoke, Virginia, testified that a letter from Allstate bearing the signature of Mr. Jones was mailed to Mr. Tarrant on March 25, 2005. This letter alluded to changes in insurance coverage but did not state the amount of coverage available on each vehicle. The letter stated in part as follows:

> The accompanying Amended Policy Declarations includes these changes:
> The addition of your 03 Dodge Trk Dr3500 2wd.
> The addition of your 95 Lexus Es300.
> A change in insurance coverage for your 02 Chrysler Town–Country.
> A change in description for your 02 Chrysler Town–Country. The addition of the passive restraint discount 02 Chrysler Town–Country.
> The deletion of one or more operators.

The letter further noted that the "coverages and limits you carry for your vehicles, and the costs of those coverages, are listed in detail on the enclosed Amended Policy Declarations." The enclosure, however, was not admitted into evidence at the trial. Mr. Tarrant did not testify that he received it, nor did the trial court make any finding of fact that he received it.[3]

Ms. Collard also confirmed that on April 15, May 16, and June 15, 2005, Allstate mailed to Blue Ribbon Cleaning, Inc., "commercial automobile insurance" bills that did not include the van among the list of covered vehicles, and these bills were paid. Ms. Collard also confirmed that on April, 20, 2005, and May 20, 2005, Allstate mailed "personal automobile insurance" bills to Mr. Tarrant that included the van among the list of insured vehicles, and these bills were paid. Ms. Collard testified that as a result of the transfer of the van and the other two vehicles from the commercial policy to the personal policy, there was a savings of $2,867.74 in premiums. The premium bills did not specifically state the amount of liability coverage available on the various insured vehicles.

Mr. Tarrant testified that he would regularly call the Jones Agency to discuss his premium. After he received the commercial policy renewal notice in early 2005 showing a "substantial increase" in the premium as compared to the previous year, he called the Jones Agency to see what could be done about lowering it. He stated that he never told an employee of the Jones Agency to remove the van from the commercial policy. "We got a quote back [from the Jones Agency] what it would cost for us to keep the vans in the commercial line and then what we could put everything else in the personal line." Mr. Tarrant attested that his instructions to the Jones Agency were "to put all the

---

**3.** Although the dissent states that in March, Mr. Tarrant was sent "The Amended Policy Declarations" which listed the amount of the van's liability insurance coverage and the amount of the premium, the Declarations admitted into evidence were not sent to Mr. Tarrant in March but rather were part of a packet of information sent to Mr. Tarrant as a result of a change in driver assignment that was effective on May 20, 2005 and resulted in a premium increase of $2.30.

vans under the commercial policy." Mr. Tarrant testified that there was no question in his mind about the instructions he gave the Jones Agency. He further testified that when he talked to Ms. Smith, he did not know that the Jones Agency's records did not list Blue Ribbon as the titled owner of the van. He noted that the van was the only vehicle that he owned at the time that was titled in the name of the business and that "of all the vehicles [it] would have been the one for sure that would have remained in the commercial policy." He testified that use of the van was divided equally between business and personal use. He stated that he did not recall getting the March 25, 2005 letter from the Jones Agency indicating the changes in his coverage and that he did not know that the van had been moved to the personal policy until May of 2009, when he and his attorney were reviewing his insurance records. Mr. Tarrant testified that until that time, although checks were written to pay the premium bills, he never looked at the premium bills. His daughter, whom he employs as his secretary, would make out the checks for payment of the bills, and "at a glance" he would sign them and send them to Allstate.

The trial court found that although Mr. Tarrant instructed the Jones Agency to place the vans under the commercial policy, maybe there had been a misunderstanding that resulted in the van being placed under the personal policy. The trial court determined that Mr. Tarrant had ratified the change in coverage because he had received the March 25, 2005 letter denoting changes to his coverage and had also received premium bills showing that the van was covered under the personal policy.[4] The trial court held that at the time of the accident, the van was covered under the personal policy, not the commercial policy. The Court of Appeals reversed the trial court, holding that Allstate failed to follow Mr. Tarrant's instruction that the van be covered under the commercial policy and that Mr. Tarrant's receipt of notification of the change in coverage and payment of premium bills reflecting the change did not absolve Allstate from liability. *Allstate Ins. Co. v. Tarrant,* No. E2009–02431–COA–R3–CV, 2010 WL 4188232 at *10 (Tenn.Ct.App. Oct. 21, 2010).

We granted Allstate's application for permission to appeal and address two issues: 1) whether Mr. Tarrant ratified the transfer of the van from the commercial policy to the personal policy; 2) if Mr. Tarrant did not ratify the transfer, whether Allstate is estopped from denying coverage of the van under the commercial policy.

## II.

■ We begin our analysis with the trial court's findings of fact as to whether Mr. Tarrant instructed the Jones Agency to move the van from the commercial policy to the personal policy. Neither Mr. Jones nor Ms. Smith had any personal recollection of their conversation with Mr. Tarrant when he called the Jones Agency in March of 2005. Mr. Jones recalled no conversation with Mr. Tarrant and stated that he would have referred Mr. Tarrant to Ms. Smith. Ms. Smith testified that she had no independent recollection of her conversation with Mr. Tarrant or of any steps she took as a result of the conversation. Her testimony as to what transpired at that time was based on her review of the billing history. Although Mr. Jones denied that the Jones Agency made a mis-

---

4. The trial court did not find nor does the record show that Allstate provided Mr. Tarrant with a copy of either his commercial policy or personal policy between the time Allstate placed the van under the personal policy and the time of the accident.

take, at the same time he acknowledged the possibility of a mistake by the Jones Agency, stating that if the agency made a mistake, it was Mr. Tarrant's responsibility to notify the agency of the mistake upon his receipt of proof of insurance cards. In contrast, Mr. Tarrant testified that he specifically told the Jones Agency to "go ahead and put all of the vans in the commercial line, the ones we were using for business." This included "the '84 Dodge Ram, the '98 Dodge Ram, the Ford Econoline 150 and the Town and Country Van." He testified that there was no question in his mind that he gave the instruction to the Jones Agency to place the van on the commercial policy. The trial court found that Mr. Jones, Ms. Smith, and Mr. Tarrant were all credible witnesses and then specifically noted that Mr. Tarrant testified that "what he told them at the Jones [A]gency was look, his words were, put the vans on the commercial policy, put the other vehicles on the personal policy."

■ We review the trial court's findings of fact de novo upon the record of the trial court, accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn. R.App. P. 13(d). As to the weight and credibility to be given the testimony of witnesses, we must afford considerable deference to the trial court's findings of fact based upon the court's assessment of live testimony. *Dixon v. Travelers Indem. Co.*, 336 S.W.3d 532, 536 (Tenn.2011); *Padilla v. Twin City Fire Ins. Co.*, 324 S.W.3d 507, 511 (Tenn.2010). Because a trial court is in a position to observe witnesses and assess their demeanor and other indicators of credibility, a trial court's determination of credibility will not be overturned on appeal unless there is clear and convincing evidence to the contrary. *Hughes v. Metro. Gov't of Nashville & Davidson Cnty.*, 340 S.W.3d 352, 360 (Tenn.2011); *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn.1999).

We construe the trial court's finding to be that Ms. Smith testified as to what she would have done based on her usual practice and that Mr. Tarrant testified as to what he did. The trial court's finding that Mr. Tarrant was credible implicitly constitutes a finding that Mr. Tarrant told Ms. Smith to place the van on the commercial policy. The trial court's finding that Ms. Smith was credible constitutes a conclusion that she testified truthfully that her *usual practice* would have been to follow the instruction of the insured and does not contradict the trial court's finding as to what Mr. Tarrant actually did. Based on the trial court's determinations as to the witnesses' credibility and the testimony of those witnesses, the inference is inescapable that Mr. Tarrant instructed Ms. Smith to place the van on the commercial policy and she failed to do so; her action of placing the van on the personal policy constituted a mistake by the Jones Agency.

The dissent is based on the premise that the trial court made a finding of fact that "the parties' coverage dispute arose from a 'good faith misunderstanding' regarding the meaning of the word 'vans.'" This premise is not supported by the proof at trial. When announcing its decision, the trial court speculated as to what may have occurred, noting, "Well, maybe maybe maybe that this case only comes down to a misunderstanding about the definition of the word van." Later the trial court said "[b]ut the case may boil down to just nothing more than a misunderstanding about what one side honestly meant one thing about the word van and the other side honestly understood another thing about it." We disagree that a statement by the trial court that "maybe maybe maybe" there was a misunderstanding as to the meaning of the word "van" qualifies as a judicial finding of fact on which to base a legal conclusion. The trial court also sub-

sequently stated, "I'm satisfied it is nothing more than a good faith misunderstanding about what the meaning of the word vans was." Given the court's prior equivocal statements, it is unclear whether this statement qualifies as a finding of fact based on proof before the court or is instead a conclusion based on nothing more than the court's speculation as to what might have happened. More importantly, there simply is no evidence to support the conclusion that there was a misunderstanding about meaning of the word "van." Neither Mr. Jones nor Ms. Smith testified that they were confused about what Mr. Tarrant meant when he referred to the van. Neither recalled any such discussion with Mr. Tarrant. While Mr. Tarrant speculated that "*if* [the Jones Agency wasn't] aware that [the Chrysler Town and Country van] was a van [that] may have been the reason that they miss understand [sic] the directions," (emphasis added) there is no proof that the Jones Agency was not aware that the subject van was a van. Because the underlying contingency of this statement was not met, it does not constitute a concession that the Jones Agency's failure to include the van on the commercial policy was the result of a misunderstanding as to the nature of the vehicle. The trial court could not reasonably infer from this testimony or any other evidence in the record that the Jones Agency's failure to list the van on the commercial policy was the result of a misunderstanding as to the definition of "van." *See Underwood v. HCA Health Serv. of Tenn., Inc.,* 892 S.W.2d 423, 426 (Tenn.Ct. App.1994) ("An inference is reasonable and legitimate only when the evidence makes the existence of the fact to be inferred more probable than the nonexistence of the fact."). Given Mr. Tarrant's instruction that all the vans be covered under the commercial policy, an instruction credited by the trial court as a finding of fact, listing the van in question on the personal policy was the Jones Agency's mistake. It makes no difference if the mistake was the result of the agency's negligence in failing to follow Mr. Tarrant's instructions or whether the mistake was the result of its confusion as to the nature of· the vehicle.

### III.

■ Next, we address the question of whether Mr. Tarrant ratified the transfer of the van to the personal policy. The trial court determined that even if Mr. Tarrant did not authorize the transfer of the van to the personal policy and the Jones Agency made a mistake in making the transfer, Mr. Tarrant ratified the transfer when he continued to pay premiums on the policies after receiving the March 25, 2005 letter and premium bills indicating that the van was covered under the personal policy.

■ In order for Mr. Tarrant to ratify Ms. Smith's mistake, Ms. Smith must have been acting in the stead of Mr. Tarrant and for his benefit when the van was transferred to the personal policy. "Ratification of a contract occurs when one approves, adopts, or confirms a contract previously executed by another[,] in his stead and for his benefit, but without his authority." *Webber v. State Farm Mut. Auto. Ins. Co.,* 49 S.W.3d 265, 270 (Tenn.2001) (alteration in original) (internal quotation marks omitted); *Harber v. Leader Fed. Bank for Sav.,* 159 S.W.3d 545, 552 (Tenn. Ct.App.2004).

The Jones Agency did not act in the stead of Mr. Tarrant in making the policy change. "Stead" is defined as "the place of a person or thing as occupied by a successor or substitute." *Webster's Encyclopedic Unabridged Dictionary of the English Language* 1390 (1989). Mr. Tarrant acted on his own behalf in requesting that all the vans be placed on the commercial policy and the other vehicles placed on the personal policy. Ms. Smith, by performing the clerical tasks necessary to implement

Mr. Tarrant's request, acted in the place of Allstate, not Mr. Tarrant. Ms. Smith did not perform any task that Mr. Tarrant would have been able to perform himself since he did not have access to the Allstate computer system.

This is consistent with the General Assembly's determination that in disputes arising out of an application for insurance or an insurance policy, the insurance producer, which in this case is the Jones Agency, is the agent of the insurer, Allstate, and not the insured:

> [a]n insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from the application for insurance or any policy issued in connection with the application between the insured or insured's beneficiary and the insurer, as the agent of the insurer and not the insured or insured's beneficiary.

Tenn.Code Ann. § 56–6–115(b) (2008).

[6] This statute serves the purpose of preventing an insurance company " 'from denying responsibility for representations and actions from the agent from whom applications are voluntarily accepted' " and of " 'protect[ing] an applicant who relies on such representations or actions,' " and the statute is to be liberally construed in favor of the insured. *Bill Brown Constr. Co. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 4 (Tenn.1991) (quoting 15 Tenn. Jur. *Insurance* § 9 (1984)). Declaring the insurance producer to be the agent of the insurer, not the insured, is tantamount to declaring that the producer acts in the stead of the insurer, not the insured, an "agent" being "[o]ne who is authorized to act for or in

place of another; a representative." *Black's Law Dictionary* 64 (7th ed.1999). Based on Tennessee Code Annotated section 56–6–115(b), an insurance producer acts in the place of the insurer and not the insured. Ms. Smith merely listened to Mr. Tarrant and assumed the place of Allstate by entering his requests, as she understood them, into the insurer's system. *See also Gen. Accident Fire & Life Assurance Corp. v. Browne*, 217 F.2d 418, 422 (7th Cir.1954) (holding that insurance agency was acting as agent of insurer, not insured, in acceding to insured's request to keep him insured against liability in the operation of his automobile, stating "[m]ere attention to the needs of a customer does not make a business man the agent of a customer.")

Tennessee Code Annotated section 56–6–115(b) applies to the renewal of an insurance policy as well as the application for the original policy. In *Maryland Casualty Co. v. McTyier*, 150 Tenn. 691, 266 S.W. 767 (1924), we construed the predecessor statute to Tennessee Code Annotated section 56–6–115(b), which also referred to the "application," and not specifically to a renewal policy.[5] We quoted with approval the following language from *Schoener v. Hekla Fire Ins. Co.*, 50 Wis. 575, 7 N.W. 544, 546–47 (1880), a Wisconsin case construing that state's similar statute:

> "[T]he Legislature has assumed the right to regulate the business of insurance, and prescribe the manner in which it shall be conducted in this state. It has declared that whoever solicits insurance on behalf of an insurance company, or makes any contract of insurance, or in any manner aids or assists in making

---

5. As quoted by the *McTyier* Court, this earlier statute provided that

> "any person who shall solicit an application for insurance shall in all matters relating to such application and the policy issued in consequence thereof be regarded as an agent of the company issuing the policy,

and not the agent of the insured, and all provisions in the application and policy to the contrary are void and no effect whatever...."

*McTyier*, 266 S.W. at 767 (quoting Chapter 442, Acts of 1907).

such contract, or *transacts any business for the company,* shall be held an agent of such company to all intents and purposes."

*McTyier,* 266 S.W. at 769 (emphasis added). Accentuating the statutory language "and the policy issued in consequence thereof," the *McTyier* Court stated that "[i]t was manifestly not the intention of the Legislature to restrict the agency representation of the [insurance] company to matters relating to the application only, but to extend it to all matters relating to the policy issued." *Id.* at 768; *see also T.H. Hayes & Sons v. Stuyvesant Ins. Co.,* 194 Tenn. 35, 250 S.W.2d 7, 11 (1952); *Tenn. Storm Window & Hardware Co. v. Newark Ins. Co.,* 506 S.W.2d 792, 795–96 (Tenn.Ct.App.1973). Renewal of the policy issued is a "matter[ ] relating to the policy issued." We find no distinction between the language of the earlier statute construed by the Court in *McTyier* and that of the statute in its current form, which replaces the phrase "the policy issued in consequence of [the application]" with "any policy issued in connection with the application." If anything, the substitution of the adjective "any" for "the" in the current version lends stronger support to the conclusion that the statute is intended to encompass a renewal policy as well as the policy originally issued.

Our conclusion is in accord with the Arkansas Supreme Court's decision in *Coal Operators Casualty Co. v. F.S. Neely Co.,* 219 Ark. 579, 243 S.W.2d 744 (1951). In that case, the insured, a coal mining business, purchased a workers' compensation insurance policy through an insurance agency. *Id.* at 744. The policy covered the insured's business operations in both Arkansas and Oklahoma. *Id.* The policy was renewed the next year with coverage extending to both states; however, when it was renewed a third time, it was issued to cover operations solely in Oklahoma. *Id.* at 745. After the third renewal, one of the

insured's employees was injured in Arkansas, and the insurance company denied coverage. *Id.* In addressing the question of whether the insurance agent was a broker acting as agent for the insured or an agent of the insurance company, the Arkansas Supreme Court considered Arkansas and Oklahoma statutes similar to section 56–6–115(b), which were respectively quoted as follows:

"Any person, who shall hereafter solicit insurance or procure applications, shall be held to be soliciting agent of the insurance company or association issuing a policy on such application, or on a renewal thereof, anything in the application or policy to the contrary notwithstanding."

*Neely Co.,* 243 S.W.2d at 745 (quoting Ark. Stats. § 66–302).

"Any person who shall solicit and procure an application for insurance shall, in all matters relating to such application for insurance, and the policy issued in consequence thereof, be regarded as the agent of the company issuing the policy and not the agent of the insured, and all provisions in the application and policy to the contrary are void and of no effect whatever."

*Neely Co.,* at 745–46 (quoting Okla. Stats. tit. 36, § 197). The Oklahoma statute, like section 56–6–115(b), referred only to an application for insurance and a policy issued in connection with the application and did not specifically include a renewal, as did the Arkansas statute. The Court, however, determined that both statutes were to the same effect and that, as applied to the facts of the case, both statutes made the insurance agent the agent of the insurance company in issuing the renewal. *Id.* at 746.

We find that Ms. Smith did not assume the place of Mr. Tarrant, and she was also statutorily precluded from acting in his stead. Nor did Ms. Smith act for the

benefit of Mr. Tarrant. "Benefit" is defined as "[p]rofit or gain." *Black's Law Dictionary* 150 (7th ed.1999). Mr. Tarrant did not realize a profit or gain from Ms. Smith's actions. While Mr. Tarrant's premiums were lower after the transfer,[6] he also received commensurately lower coverage and assumed greater personal risk. While Allstate received a lower premium payment, it enjoyed a commensurate decrease in liability exposure. Consequently, in terms of the change in premium rate and risk exposure, neither party enjoyed a positive benefit. Allstate did, however, otherwise benefit from the transaction in that it was able to retain Mr. Tarrant's business. Mr. Jones testified that Mr. Tarrant had threatened to take his business elsewhere if nothing could be done to lower his premiums.[7]

Not only did Allstate actually receive a benefit from Ms. Smith's mistake, the evidence also demonstrates that Ms. Smith was primarily motivated to benefit Allstate. The Jones Agency acted in furtherance of its goal of retaining Mr. Tarrant's business, which inured to the benefit of Allstate. The Jones Agency performed no act or service for Mr. Tarrant inconsistent with obtaining insurance business for itself and Allstate. Further, Mr. Jones admitted that his agency's primary allegiance is to Allstate, not Mr. Tarrant, stating: "[T]he company is primary. The insured is next in line. So if we do make a mistake, it is the obligation of the insured to correct us." The only negative consequence that the Jones Agency would have experienced had it refused to insure Mr. Tarrant's property would have been the loss of Mr. Tarrant as a customer, with the corresponding loss of its percentage of the insurance premiums he would have paid.

To conclude, since the Jones Agency neither acted in the place or stead of Mr. Tarrant, nor for his benefit, Mr. Tarrant could not have ratified its mistake by continuing to pay the premiums after receiving the March 25, 2005 letter and premium notices indicating that the van had been moved to the personal policy.

## IV.

■ The final issue we address is whether Allstate was estopped from denying coverage of the van under the commercial policy.[8]

■ An insurance company is generally deemed estopped to deny policy liability on

---

6. Although Ms. Collard testified that Mr. Tarrant realized a total premium savings of $2,867.74 as a result of the transfer of the van and the other two vehicles to the personal policy, there was no testimony as to what portion of this amount was specifically attributable to the transfer of the van. Obviously, a significant portion, if not the majority, of the $2,867.74 premium decrease can be ascribed to the change in coverage on the 1985 Lexus and the 2003 Dodge truck, which were transferred from the commercial policy to the personal policy at the same time as the van.

7. Allstate also appears to have benefitted in another respect. Ms. Smith testified that at the time of the transfer, the van was insured under a commercial fleet policy that carried a lower premium than a non-fleet policy. However, Ms. Smith stated that "[y]ou have to have five vehicles for a commercial policy to obtain the fleet discount." The transfer of three of the six vehicles that, prior to March 2005, had been covered under the commercial policy brought the total number of vehicles insured under that policy below the minimum five required to qualify for the fleet premium discount. Consequently, an advantage accrued to Allstate because the premium rate per vehicle on each of the three vehicles remaining on the commercial policy increased without any increased liability exposure to Allstate. While it is true that the commercial fleet discount would have been lost even had the van not been transferred from the commercial policy, it is apparent that, on the whole, the transaction benefitted Allstate, not Mr. Tarrant.

8. Allstate argues that we are precluded from applying the rule of estoppel because this

a matter arising out of the negligence or mistake of its agent, and if either party has to suffer from an insurance agent's mistake, it must be the insurance company. *See Vulcan Life & Accident Ins. Co. v. Segars*, 216 Tenn. 154, 391 S.W.2d 393, 397 (1965); *Magnavox Co. of Tenn. v. Boles & Hite Constr. Co.*, 585 S.W.2d 622, 627 (Tenn.Ct.App.1979); *Henry v. S. Fire & Cas. Co.*, 46 Tenn.App. 335, 330 S.W.2d 18, 32 (1958); 44A Am.Jur.2d *Insurance* § 1580 (2003); 46 C.J.S. *Insurance* § 1207 (2007).

The Court of Appeals determined that this rule cannot be utilized to estop Allstate from denying coverage of the van because, in fact, Allstate did not deny coverage but allowed coverage under the personal policy. See *Tarrant*, 2010 WL 4188232, at *9. We do not agree. Allstate seeks to deny coverage under the commercial policy and is therefore subject to estoppel as to the commercial policy. It is immaterial that coverage of the van is allowed under the personal policy. The Court of Appeals' incorrect reasoning undermines the rule's function in protecting the insured from the mistakes of the insurance agent.

█ The insurer—not the insured— should bear the consequences of an error by the insurer's agent. The rationale for estopping an insurance company from taking advantage of its agent's mistake was noted by this Court in *Vulcan:*

> "[T]he man on the street purchases his insurance policy in very much the same way that he purchases his automobile or his reaper or other chattels. He knows no more about the making of a contract of insurance than he does about the making of an automobile, and he naturally relies upon the skill and good faith of those who hold themselves out to be experts in such matters, by advertising their wares for sale. It would seem to be the clear duty of the insurer, professing to draw an instrument protecting the applicant's property against certain defined perils, to exercise due diligence to supply a policy which will effect the purpose intended. Any damage caused to the applicant through the agent's mistakes or negligence in making inquiries that he should know to be pertinent should rest on the insurer."

391 S.W.2d at 397.

█ Allstate argues that Mr. Tarrant should be denied coverage under the commercial policy because he failed to discover the change in coverage on the van when he received the March 25, 2005 letter and when he paid the subsequent premium bills. There is no proof that Allstate sent Mr. Tarrant a policy after the change in coverage.[9] The March 25, 2005 letter

---

issue was not raised at trial. However, the record belies this assertion and shows that the issue of estoppel was presented to the trial court by both Mr. Leatherwood's attorney and Mr. Tarrant's attorney. The trial brief of Mr. Leatherwood's attorney cited case law pertaining to estoppel, and the matter of estoppel was also raised by Mr. Tarrant's attorney in closing argument when he stated "Allstate can't benefit from a mistake, your Honor. The law is pretty clear on that. They can't benefit at the expense of their insured on a mistake they made." Tennessee Rule of Civil Procedure 15.02 provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." We deem the issue of estoppel to have been tried by implied consent of the parties, and the issue is properly considered by this Court.

9. Even had Allstate sent Mr. Tarrant a copy of the policy, courts have taken judicial notice of the fact that an insured will customarily accept and retain an insurance policy without reading it. *Henry*, 330 S.W.2d at 32; *Brewer v. Vanguard Ins. Co.*, 614 S.W.2d 360, 363 (Tenn.Ct.App.1980); *Smith v. Continental Ins. Co.*, 63 Tenn.App. 48, 469 S.W.2d 138, 147 (1971).

mailed to Mr. Tarrant noted there was a change in coverage, but did not state what the change in coverage was. The subsequent premium bills sent to Mr. Tarrant and Blue Ribbon were either for commercial or personal coverage and did not state the amount of coverage. It was not apparent from the face of the March 25, 2005 letter or the premium bills that the coverage on the van had decreased from $500,000 to $100,000 per person/$300,000 per accident. However, even if the letter and bills were deemed to be clear disclosures of the changes in his coverage, Allstate should not be relieved of liability due to its agent's error because Mr. Tarrant failed to discover the error after reading the letter and premium bills. As stated in *Henry,*

> Where the [insurance] company or its agent delivers to the insured a policy which is known, or should be known, to be defective, such conduct is a representation that the policy is valid and effective for the purpose intended. And the insured, if he is ignorant of the defect and has no special competence or experience in insurance matters is privileged ... to rely upon that representation without reading or being charged with the contents of the policy.

*Id.,* 330 S.W.2d at 32. In *Henry,* the insured plaintiffs operated a logging business and sought compensation from their insurer for damages incurred after one of their logging trailers was involved in an accident. *Id.* at 20. Before the accident, the insurer had issued to the plaintiffs policies containing a clause that excluded coverage of the trailer. *Id.* at 20–21. The court held that if the jury found that the plaintiffs had requested that the insurer's agent write the policies to provide full and complete liability coverage on all of their equipment and the agent erred in failing to comply with the plaintiffs' request, the insurer would be estopped from denying full coverage, even though the plaintiffs failed to read their policies. *Id.* at 32.

Mr. Tarrant requested that the van be covered under the commercial policy. Despite Allstate's implicit assurance that this request would be complied with, it was not, due to the mistake of Allstate's agent. Under these circumstances, Allstate is estopped from denying coverage, notwithstanding Mr. Tarrant's failure to discover the error from the mailings he received. *See also, Magnavox,* 585 S.W.2d at 628 (Insurer not guilty of contributory negligence in accepting without protest policies containing exclusionary clause where insured was "lulled into a false sense of security" by insurance agent.) [10]

To hold otherwise would place the burden on the insured to discover and protect himself or herself from mistakes of the insurer's agent and relieve the insurer from any responsibility for the errors of its agent. Mr. Tarrant relied on the Jones Agency to provide the insurance coverage he requested and as a result of the Agency's mistake, the coverage was not provided. Accordingly, Allstate is estopped from denying coverage of the van under the commercial policy. We do not disagree with the dissent's assertion that insurance policies are as a general matter controlled by basic contract principles. However, as to the specific matter of a mistake by an insurance agent as occurred in this case, the common law clearly dictates that the insurer is estopped to deny coverage.

---

10. In *Morrison v. Allen,* 338 S.W.3d 417 (Tenn.2011), we held that the financial planner who was employed by the insured to procure an incontestable insurance policy was liable to a beneficiary under the policy for breach of contract because the planner failed to correctly fill out the insurance application form on behalf of the insured. The beneficiary was allowed recovery despite the insured's failure to read the application and correct the misstatement. *Id.* at 429.

This is not a "failure to read" case, but one in which the insured instructed his insurance agent to make a change in the insured's insurance coverage, and the agent made a mistake in carrying out the instruction. As a result, the insured did not receive the coverage he requested. Under these circumstances, it is the insurer who must bear the consequences for the loss, not the insured. To hold otherwise would ignore the facts and well-settled law and allow an insurance agent or company to err at will without any consequences and place the full burden on the insured to discover and correct the insurer's mistake.

## V.

We hold that the Jones Agency's mistake in transferring the van from the commercial policy to the personal policy was not subject to ratification by Mr. Tarrant because in effecting the transfer, the Jones Agency did not act in Mr. Tarrant's stead or for his benefit. We further hold that because the van was transferred from the commercial policy as the result of the mistake of the Jones Agency, Allstate is estopped from denying coverage of the van under the commercial policy. Accordingly, the van is insured under the commercial insurance policy issued by Allstate. This cause is remanded to the trial court for further proceedings consistent with this opinion, which shall include determining any additional amount of premiums due Allstate and the Jones Agency for coverage of the van under the commercial policy. The judgment of the Court of Appeals is affirmed on different grounds.[11] Costs are assessed against appellant, Allstate Insurance Company, and its surety, for which execution may issue if necessary.

WILLIAM C. KOCH, JR., J., dissenting.

We granted the Tenn. R.App. P. 11 application in this case to determine whether an insured, who requested replacement insurance coverage on his personal and business vehicles in order to reduce his premiums, is entitled to more coverage than that provided in his new personal policy when he failed to read the amended policy declarations and to notify the insurance company that he desired different coverage on one of his vehicles. Applying settled legal principles to the essentially undisputed facts of this case, I would hold that the insured accepted the new coverage by failing to review the amended policy declarations and to give the insurance company timely notice that the coverage was less than he desired.

## I.

John Tarrant owns and operates Blue Ribbon Cleaning, Inc. ("Blue Ribbon"), a cleaning business that requires the use of a number of vehicles. Since 1990, he obtained the insurance for his commercial vehicles and his personal vehicles from Allstate Insurance Company ("Allstate") through the Lonnie Jones Insurance Agency in Knoxville. This insurance was provided in two policies—one for his commercial vehicles and one for his personal vehicles. The commercial policy had a combined liability limit of $500,000; while the personal policy had $100,000/$300,000/$100,000 liability limits.

In 2003, Mr. Tarrant transferred a number of his vehicles from his personal policy[1] to a commercial fleet policy[2] in order

---

11. We may affirm the judgment of a lower court on grounds different from those relied upon by the court below where the lower court has reached the correct result. *Cont'l Cas. Co. v. Smith,* 720 S.W.2d 48, 50 (Tenn. 1986).

1. The personal insurance policy is in the name of "John H. Tarrant."

2. The commercial insurance policy shares the same mailing address as the personal policy but is in the name of "Blue Ribbon Cleaning Inc."

to obtain a discount on his premiums. These changes took effect on April 4, 2003. One of the vehicles transferred to the commercial fleet policy was a 2002 Chrysler Town & Country minivan that was regularly driven by his wife and that was used for both personal and business purposes.

Mr. Tarrant's commercial fleet policy came up for renewal in 2005. On January 27, 2005, Allstate mailed Mr. Tarrant a renewal package stating that the renewal premium would be $7,024 per year. Later, on March 16, 2005, Allstate mailed a bill to Mr. Tarrant stating that the renewal premium was $6,359. Upon receiving this renewal notice, Mr. Tarrant told Lonnie Jones that he desired a lower premium.[3]

Mr. Jones asked Patricia Smith, one of his employees, to work with Mr. Tarrant to lower his premiums. Mr. Tarrant later testified that he requested Ms. Smith to "put all of the vans in the commercial line" and to move the other vehicles to his personal policy. Ms. Smith testified that she would not have moved the 2002 Chrysler minivan regularly driven by his wife to the personal policy unless Mr. Tarrant had asked her to do so. Accordingly, when she requested Allstate to revise the coverage for Mr. Tarrant's vehicles, the 2002 Chrysler minivan was moved from the commercial fleet policy to Mr. Tarrant's personal policy.

These changes in coverage saved Mr. Tarrant approximately $3,000 in premiums. Ms. Smith telephoned Mr. Tarrant to confirm the new premium but did not discuss the specific coverage of each vehicle at that time. After Mr. Tarrant approved the new premium, Ms. Smith finalized the coverage in Allstate's computer with an effective date of April 4, 2005—the renewal date of the commercial fleet policy.

On March 25, 2005, Allstate mailed Mr. Tarrant a computer-generated letter stating:

> We've sent along this mailing to verify the changes to your policy that you recently requested.... Please look over all the information in this mailing, and call us right away if you have any questions or if anything isn't exactly right.

The letter also summarized the changes in Mr. Tarrant's coverage. Among the changes in coverage noted in the letter were "[a] change in insurance coverage for your 02 Chrysler Town–Country" and "[a] change in description for your 02 Chrysler Town–Country." The letter also referred to an "accompanying Amended Policy Declarations" that more thoroughly explained the changes. The amended auto policy declarations included a cover page showing each vehicle on the personal policy with its premium, as well as a separate page for each vehicle showing the liability coverages for that vehicle. The 2002 Chrysler minivan's page clearly states that the liability limit for that vehicle is $100,000/$300,000/$100,000, and lists the policy number for the personal policy.

Mr. Tarrant received four bills from Allstate during the months leading up to his wife's June 17, 2005 accident in the 2002 Chrysler minivan. Two bills, dated April 15 and May 16, 2005, and addressed to Blue Ribbon, related to Mr. Tarrant's commercial insurance policy. The 2002 Chrysler minivan was not one of the vehicles listed on those bills. During the same period, on April 20 and May 20, 2005, Allstate mailed Mr. Tarrant two bills regarding his personal insurance policy. Both of these bills reflected that the 2002 Chrysler minivan was one of the vehicles covered by the personal policy. In addi-

---

**3.** Mr. Jones testified that Mr. Tarrant told him "if you can't beat this [renewal premium], I'm going to leave you."

tion to these bills, Mr. Tarrant also received another amended policy declaration for his personal insurance policy in May 2005 after he removed his son as a driver on his personal policy.

Even after his wife's accident in the 2002 Chrysler minivan in June 2005, Mr. Tarrant continued to pay the premiums on his personal policy that provided insurance coverage for the Chrysler minivan. Despite the accident, he never questioned the fact that the minivan was covered by his personal policy rather than his commercial policy. Mr. Tarrant removed the 2002 Chrysler minivan from his personal policy in May 2006 only because he traded in the minivan for another vehicle. It was not until the litigation regarding the accident was underway that Mr. Tarrant took issue with the coverage of the 2002 Chrysler minivan under his personal policy.

Allstate filed an action in the Chancery Court for Sevier County seeking a declaratory judgment regarding whether Mr. Tarrant's 2002 Chrysler minivan was covered under his personal policy or under his commercial policy. The trial court conducted a bench trial on September 22, 2009. Allstate's position at trial was that the coverage on Mr. Tarrant's personal and commercial vehicles was precisely the coverage he had requested[4] and that the change in coverage was accurately and repeatedly reflected in the many mailings that were sent to Mr. Tarrant. An employee from Allstate's corporate office provided a list of all mailings to Mr. Tarrant regarding his policies and confirmed that all these materials had been mailed.

For his part, Mr. Tarrant insisted that he never requested that the 2002 Chrysler minivan be removed from his commercial policy. He stated that he was "always . . . very clear" and that he said "the things that I want done in a manner that is not easily misinterpreted." However, he conceded that his instructions "to put all of the vans under the commercial policy . . . may have been the reason that they [mis-understood] the directions."

Even though Mr. Tarrant could not recall receiving Allstate's March 25 letter,[5] the trial court later found that Allstate had mailed the letter.[6] Mr. Tarrant also conceded that he did not go through or look at all the materials that Allstate sent to him[7] because his daughter served as his secretary, and she "would make out the bills and have them ready for me to sign and at a glance I would sign them like any business would and send them on." One of the recurring themes in Mr. Tarrant's case

---

4. Ms. Smith, whom the trial court later found to be credible, testified that she moved the 2002 Chrysler minivan from Mr. Tarrant's commercial policy to his personal policy because Mr. Tarrant told her to. When asked, "Why did you move the Town and Country van to the personal lines policy?", Ms. Smith replied, "Because Mr. Tarrant requested that I do that." When later asked, "Is it true, Ms. Smith, that Mr. Tarrant actually requested that these three vehicles be moved?", Ms. Smith responded, "Yes, or I would not have done it otherwise."

5. When the trial court asked him directly, "Did you get that letter?", Mr. Tarrant replied, "I don't remember getting a letter like that."

6. During its findings from the bench, the trial court stated:

It's clear it was mailed out to Mr. Tarrant before the renewal date of the commercial policy which was April 4th. It's clear it was mailed to him. Now, he said I don't recall having gotten the letter. He didn't say he didn't get it. And once again, good for him, good for him . . . . But it's clear to me that the letter went out.

7. When asked, "How much time do you take to look at that bill and review it and see what's on it and what's not on it?", Mr. Tarrant responded, "Well, with all the insurance forms and loans we pay, all the premiums we pay, honestly, I don't go though it and look at every little thing in it."

was that most business persons do not read communications from their insurance companies regarding their insurance coverage.[8]

The trial court announced its decision from the bench following the trial on September 22, 2009. The trial court commented that it believed that all the witnesses who had testified—including Mr. Tarrant, Mr. Jones, and Ms. Smith—were credible and that the court was "impressed . . . with the honesty and straightforwardness."

After thoroughly reviewing the testimony, the trial court stated that "the case may boil down to just nothing more than a misunderstanding about what one side honestly meant one thing about the word van and the other side honestly understood another thing about it."[9] Accordingly, the trial court found that "the preponderance of the evidence here lies that even if it was a misunderstanding, even if that's all it was, and I'm satisfied . . . it is nothing more than a good faith misunderstanding about what the meaning of the word vans was."[10] Based on this finding of fact, the trial court held as follows:

> Even if that's all it was, I'm constrained to hold that Mr. Tarrant and Blue Ribbon were notified by this March 23rd letter of the change and from which they . . . should have known if it was a misunderstanding, that, yes, there is a misunderstanding.
>
> And in addition to that they were notified by multiple additional mailings between March and the date of this accident in July[11] from which they could have known and should have known that there had been a misunderstanding.
>
> So the Court is also constrained to hold that Mr. Tarrant and Blue Ribbon [had] ratified the change even if it was

---

**8.** After noting that the renewed notices "came with 25 or 30 pages," Mr. Tarrant's lawyer argued:

> The reason it's an issue, your Honor, is just because the example I used the January 27th letter is an exhibit and it includes behind it the commercial policy renewal and included in that is many, many, many pages. Buried in that somewhere could be other information that if you had it all, you would know that.
>
> The truth is none of us ever sit down and read all of the pages that come in all these envelopes. Maybe we've learned a good lesson today and maybe now we will.

**9.** The trial court observed earlier that "according to Mr. Tarrant what he told them at the Jones agency was look . . . put the vans on the commercial policy, put the other vehicles on the personal policy. Well, maybe . . . this case only comes down to a misunderstanding about the definition of the word van."

**10.** While the Court discusses other portions of the trial court's ruling from the bench, it does not address this particular finding, even though it is the lynchpin of the trial court's decision. Rather, the Court dismisses the ex-

istence of a good faith misunderstanding between Mr. Tarrant and Ms. Smith as mere speculation without evidentiary support. I respectfully disagree. Mr. Tarrant himself alluded to the possibility that his instructions "to put all of the vans under the commercial policy . . . may have been the reason that they [misunderstood] the directions." When making findings of fact, trial judges may appropriately draw inferences that are permissible deductions from the evidence. *See Sudduth v. Williams,* 517 S.W.2d 520, 520 (Tenn.1974); *Morrison v. James,* 201 Tenn. 243, 245–46, 298 S.W.2d 714, 715 (1957); *Bell Cab & U-Drive-It Co. v. Sloan,* 193 Tenn. 352, 357, 246 S.W.2d 41, 44 (1952). An objective reading of the entire testimony of Mr. Tarrant and Ms. Smith concerning their conversations about the changes in Mr. Tarrant's insurance coverage on the "vans" provides ample basis for the trial court's finding by a "preponderance of the evidence" that "it is nothing more than a good faith misunderstanding about what the meaning of the word vans was."

**11.** The accident actually occurred in June 2005, but the trial court's mistake in the date of the accident does not undermine the legal integrity of its decision.

nothing more than a mere understanding, he's ratified it because he was notified by the March letter and some four or five additional mailings before this accident happened that specifically contained the information.

\* \* \*

For all of the foregoing reasons, as the Court told you at the beginning of its remarks, the Court's constrained to hold that the complaint for declaratory judgment is sustained and the Court holds that the coverage on the '02 Chrysler Town and Country minivan is that provided by the Tarrants['] personal policy of insurance as opposed to their commercial policy of insurance. (footnote added)

The Tarrants appealed the trial court's judgment. The Court of Appeals reversed the trial court's judgment and concluded that the 2002 Chrysler minivan was covered by Mr. Tarrant's commercial policy rather than his personal policy. *Allstate Ins. Co. v. Tarrant*, No. E2009–02431–COA–R3–CV, 2010 WL 4188232, at \*10 (Tenn.Ct.App. Oct. 21, 2010).

Rather than directly addressing the factual and legal foundation of the trial court's decision—that Mr. Tarrant "ratified" the replacement coverages by failing to notify Allstate that there was an error in the coverage on the 2002 Chrysler minivan—the Court of Appeals considered the concept of "ratification" in a completely different context. Instead of focusing on whether Mr. Tarrant had "ratified" or accepted the new insurance coverage, the Court of Appeals addressed whether Ms. Smith was acting as Mr. Tarrant's agent in the procurement of the new coverage and,

if so, whether he had ratified her acts. Relying on Tenn.Code Ann. § 56–6–115(b) (2008),[12] the Court of Appeals determined that Ms. Smith was acting as Allstate's agent, not Mr. Tarrant's agent, when she obtained the replacement insurance coverage. Therefore, the Court of Appeals held that Mr. Tarrant could not, as a matter of law, be held to ratify Ms. Smith's work. *Allstate Ins. Co. v. Tarrant*, 2010 WL 4188232, at \*6–8.

## II.

To the extent that a contracts case involves questions of fact, reviewing courts must review the trial court's factual findings de novo with a presumption of correctness. Tenn. R.App. P. 13(d); *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn.Ct.App.2000). A reviewing court may only disturb the trial court's factual findings when the evidence preponderates against them. Tenn. R.App. P. 13(d); *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 n. 5 (Tenn.2011).

Conversely, the interpretation of a contract is a legal question that this Court reviews de novo without a presumption of correctness. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn.1999); *see also Hamblen Cnty. v. City of Morristown*, 656 S.W.2d 331, 335–36 (Tenn.1983). When interpreting a contract, we must strive " 'to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the contractual language.' " *Planters Gin Co. v. Federal Compress & Warehouse Co.*, 78 S.W.2d 885, 889–90 (Tenn.2002) (quoting *Guiliano v. Cleo, Inc.*, 995 S.W.2d at 95); *accord Hill*

---

12. Tenn.Code Ann. § 56–6–115(b) provides:

An insurance producer who solicits or negotiates an application for insurance shall be regarded, in any controversy arising from the application for insurance or any policy issued in connection with the application between the insured or insured's beneficiary and the insurer, as the agent of the insurer and not the insured or insured's beneficiary. This subsection (b) shall not affect the apparent authority of an agent.

v. Tennessee Rural Health Improvement Ass'n, 882 S.W.2d 801, 802 (Tenn.Ct.App. 1994). Insurance contracts are interpreted using these same principles of contract interpretation. *Purkey v. American Home Assurance Co.*, 173 S.W.3d 703, 705 (Tenn.2005); *Fisher v. Revell*, 343 S.W.3d 776, 779 (Tenn.Ct.App.2009) (citing *Phillips v. United Servs. Auto. Ass'n*, 146 S.W.3d 629, 633 (Tenn.Ct.App.2004)).

## III.

Insurance policies are, at their core, contracts. *See Artress v. State Farm Fire & Cas. Co.*, 221 Tenn. 636, 639–40, 429 S.W.2d 430, 432 (1968); *John Weis, Inc. v. Reed*, 22 Tenn.App. 90, 98, 118 S.W.2d 677, 682 (1938). Accordingly, when courts are called upon to interpret them, the analysis must be grounded in the principles of contract law. *Christenberry v. Tipton*, 160 S.W.3d 487, 492 (Tenn.2005). Like all contracts, "[t]he formation of insurance contracts generally follows the traditional offer-and-acceptance model of the common law." 1 Jeffrey E. Thomas & Francis J. Mootz, III, *New Appleman on Insurance Law* § 3.01[1][a], at 3–4.1 to 3–5 (Law Library ed.2011) (hereinafter "*New Appleman on Insurance Law*"); *see also Woodfin v. Neal*, 16 Tenn.App. 481, 488, 65 S.W.2d 212, 216 (1933) ("Insurance is effected by an offer and acceptance, that is, by an application and acceptance by the issuance of the policy, or by the issuance of a policy accepted by the insured."). Similarly, "[r]enewal contracts have the same requirements of mutual assent, offer and acceptance and new consideration as other contracts." 1 *New Appleman on Insurance* § 3.07[1], at 3–54.

Insurance policies consist of several parts, including the declarations page, the policy form, and the endorsements. 3 *New Appleman on Insurance Law* § 16.09[1][a], at 16–195. The declarations page sets forth the most basic facts regarding the policy, including the identity of the insured, the persons or property insured, the policy period, the amount of insurance and the limits for each coverage, and the premium charges. 3 *New Appleman on Insurance Law* §§ 16.09[1][b], at 16–195, 21.01[1], at 21–3 to –4. The declarations page summarizes the essential terms of an insurance policy. *Todd v. Missouri United Sch. Ins. Council*, 223 S.W.3d 156, 160 (Mo.2007) (en banc); *Bergmann v. Hutton*, 337 Or. 596, 101 P.3d 353, 359 (2004) (en banc). It is commonly understood that the declarations page is the one page in an insurance policy that will most likely be read and understood by the insured, "and contains the terms most likely to have been requested by the insured." *See* 16 Richard A. Lord, *Williston on Contracts* § 49:25, at 139 (4th ed.2000); *see also Simalton v. AIU Ins. Co.*, 284 Ga.App. 152, 643 S.E.2d 553, 555 (2007); *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 775 A.2d 1262, 1270 (2001); *Sentry Ins. Co. v. Grenga*, 556 A.2d 998, 999–1000 (R.I.1989).

Insurance policies consist of several parts, including the declaration pages, the policy form, and the endorsement. 2 *New Appleman on Insurance Law* § 16.09[1][a], at 16–195. The declarations pages of Mr. Tarrant's insurance policies are the most important documents with regards to the coverage dispute in this case. These pages are, both in law and in fact, part of Mr. Tarrant's insurance policies and, therefore, part of the contract of insurance between Mr. Tarrant and Allstate.[13] Thus, it is of little consequence that the record

---

**13.** The Amended Auto Policy Declarations state: "Your auto policy consists of this Policy Declarations and the documents listed below. Please keep these together.—Tennessee Amendatory Endorsement form AU10704—Tennessee Auto Policy form AU141—Loss Payable Clause Endorsement form AU166."

does not reflect clearly that Allstate provided Mr. Tarrant with new copies of his auto insurance policies or the endorsements which were apparently unchanged. Allstate provided Mr. Tarrant with all the information he needed to ascertain the coverage on the 2002 Chrysler minivan when it sent him—on two occasions—the Amended Auto Policy Declarations.

There are two reasons why Mr. Tarrant is not entitled to coverage for the 2002 Chrysler minivan under the higher limits of his commercial policy. First, there was a failure of mutual assent of which Mr. Tarrant, and not Allstate, should have been aware. Second, Mr. Tarrant unconditionally accepted Allstate's proposal to provide him with replacement coverage for his commercial and personal vehicles.

### A.

It is black letter law that in order for a contract to be consummated, the parties must mutually assent to the material terms. *See* Arthur M. Kaufman & Ross M. Babbitt, *The Mutuality Doctrine in the Arbitration Agreements: The Elephant in the Road,* 22 Franchise L.J. 101, 102 (2002). Tennessee courts have referred to this requirement as a "meeting of the minds." *Staubach Retail Servs.-S.E., LLC v. H.G. Hill Realty Co.,* 160 S.W.3d 521, 524 (Tenn.2005) (quoting *Doe v. HCA Health Servs. of Tenn., Inc.,* 46 S.W.3d 191, 196 (Tenn.2001)). A meeting of the minds is determined "by assessing the parties' manifestations according to an objective standard." *Moody Realty Co. v. Huestis,* 237 S.W.3d 666, 674 (Tenn.Ct. App.2007); *see also Paragon Refining Co. v. Lee,* 98 Tenn. 643, 644–49, 41 S.W. 362, 363–64 (1897); Black's Law Dictionary 124 (8th ed. 2004) ("In modern contract law, mutual assent is determined by an objective standard—that is, by the apparent intention of the parties as manifested by their actions."). The traditional common-law rule is that where mutual assent is

lacking, no contract was ever formed. *See Higgins v. Oil, Chem. & Atomic Workers Int'l Union, Local No. 3–677,* 811 S.W.2d 875, 879 (Tenn.1991) ("The facts of this case, plainly and simply, fail to establish mutual assent. Hence, no contract between the parties ever arose."); *accord* Restatement (Second) of Contracts § 17 & cmt. c (1981); *see generally* 21 Steven W. Feldman, *Tennessee Practice: Contract Law and Practice* § 4:5, at 277–78 (2006).

The requirement of mutual assent—or a meeting of the minds—is best illustrated by the well-known case of *Raffles v. Wichelhaus,* (1864) 159 Eng. Rep. 375 (Exch.). In that case, the parties contracted for the sale of cotton " 'to arrive ex Peerless from Bombay.' " *See* Benjamin Alarie, *Mutual Misunderstanding in Contract,* 46 Am. Bus. L.J. 531, 531 (2009) (hereinafter "Alarie") (quoting *Raffles v. Wichelhaus*). Unbeknownst to the contracting parties, there were two ships named "Peerless" arriving from Bombay at different times. When the buyer refused to accept the later shipment, the English Court of Exchequer held that there was a "latent ambiguity" in the parties' contract and consequently, that there was no binding contract. Alarie, 46 Am. Bus. L.J. at 531.

As Professor Alarie has noted, "[s]ince that time it has been generally accepted in Anglo–American common law that unenforcement is the natural outcome in cases involving mutual misunderstanding." Alarie, 46 Am. Bus. L.J. at 531; *accord* Restatement (Second) of Contracts § 20(1). The Restatement contains an exception to the general rule, however, where "[one] party has no reason to know of any different meaning attached by the other, and the other has reason to know the meaning attached by the first party." Restatement (Second) of Contracts § 20(2)(b); *see also* 1 Joseph M. Perillo,

*Corbin on Contracts* § 4.13, at 636 (Revised ed. 1993) ("[I]f it is made clear that there has in fact been no such 'meeting of the minds,' the court will not hold a party bound by a contract varying from the party's own understanding unless this party's words and conduct were in a context giving the party reason to know that the other party would be and was in fact misled.")

The trial court based its decision on its factual finding that the parties' coverage dispute arose from a "good faith misunderstanding" regarding the meaning of the word "vans." [14] Like the parties in *Raffles v. Wichelhaus* who genuinely attached a different meaning to the term "Peerless," the trial court found that the parties here genuinely attached a different meaning to the term "vans." Apparently Ms. Smith, Allstate's agent, understood "vans" to mean only the full size vans; while Mr. Tarrant intended that his reference to "vans" include the 2002 Chrysler minivan.

However, because of a material factual difference between this case and *Raffles v. Wichelhaus,* the outcome in this case cannot be the same as the outcome in *Raffles v. Wichelhaus.* This difference stems from the fact that each party in *Raffles v. Wichelhaus* lacked reason to know that the other party's understanding of the operative word differed from theirs. The same cannot be said for Mr. Tarrant. While both parties in *Raffles v. Wichelhaus* were unaware that two ships named "Peerless"

were sailing from Bombay, in this case, Mr. Tarrant had good reason to know that Allstate's understanding of the word "vans" differed from his own. [15] Accordingly, the exception in Restatement (Second) of Contracts § 20(2)(b) to the general rule that no contract exists applies in this case.

Between the time that Mr. Tarrant requested changes in his insurance coverage in order to reduce his premiums and Ms. Tarrant's accident, Allstate mailed him four separate bills and two amended policy declarations. Even if Mr. Tarrant failed to receive one of the amended policy declarations, there were still at least five other Allstate mailings prior to the accident that should have put him on notice that Allstate's understanding of the term "vans" was not the same as his. These mailings clearly differentiated between Mr. Tarrant's commercial insurance coverage and his personal insurance coverage. In addition, each of the mailings always identified each of the vehicles covered by the particular policy. The 2002 Chrysler minivan was never listed as one of the vehicles covered on the commercial insurance policy and was always listed as one of the vehicles covered on the personal policy.

Had Mr. Tarrant undertaken even the most cursory examination of the numerous communications from Allstate regarding these policies, he would have quickly ascertained that Ms. Smith's, and therefore, Allstate's, understanding of the term

---

14. Like the Court of Appeals, this Court has decided that the evidence can support only one finding—that Allstate made a mistake—and has rejected the trial court's finding that these parties had a "good faith misunderstanding." The trial court found that Ms. Smith, like Mr. Tarrant, was credible. Using the standard required by Tenn. R.App. P. 13(d), I would find that the evidence simply does not preponderate against the trial court's finding that the parties had a "good faith misunderstanding."

15. In addition, persons seeking insurance have an obligation to be clear in their communications with the insurance company regarding the coverage they are seeking. When it is not clear what insurance coverage the client requested the insurance company's agent to obtain, the client may not recover for the agent's failure to procure the insurance. *See Coble Sys., Inc. v. Gifford Co.,* 627 S.W.2d 359, 364 (Tenn.Ct.App.1981).

"vans" differed from his own. Yet this record shows with little contradiction that neither Mr. Tarrant nor his daughter reviewed the policies other than to determine the amount of the premium. Were it not for this oversight, they could very easily have alerted Allstate to their disagreement regarding the coverage on the 2002 Chrysler minivan and could have obtained the coverage that Mr. Tarrant desired. Based on the facts of this case, as properly found by the trial court, I cannot fault Allstate for understanding that Mr. Tarrant's instruction to include the "vans" on his commercial policy did not include the 2002 Chrysler minivan. Rather, I would hold that, because of his inaction, Mr. Tarrant is bound by Allstate's understanding of the word "van" and that the coverage for the 2002 Chrysler minivan is provided by his personal policy.

## B.

There is a second line of reasoning supporting the conclusion that Mr. Tarrant's personal insurance policy provides the coverage for the 2002 Chrysler minivan. As a general matter, when a party seeking insurance completes an application and submits it to the insurer, the application constitutes an offer to enter into an insurance contract. *Arnold v. Locomotive Eng'rs Mut. Life & Accident Ins. Ass'n*, 30 Tenn. App. 166, 172, 204 S.W.2d 191, 194 (1946); 1 *New Appleman on Insurance* § 3.01[1][a]; 1A Steven Plitt et al., *Couch on Insurance* §§ 11:1, 11:4 (3d rev. ed.2010) (hereinafter *"Couch on Insurance "*). But this role "can be reversed where the insured requests coverage and a proposal is issued from an insurance agent with the power to bind the insurer. In such circumstances, the proposal constitutes an offer which the insured must unconditionally accept for the policy to go into effect." 1 *New Appleman on Insurance* § 3.01[1][f], at 3–23. Alternatively, the insurer's proposal may constitute a

counteroffer that the insured must accept, "usually, by payment of the first premium," and "in many ... cases, the insured's acceptance will be signified by raising no objection to the policy terms." 1 *New Appleman on Insurance* § 3.01[1][f], at 3–23; *see also* 1A *Couch on Insurance* § 16:1, at 16–3 ("The delivery of a policy that does not accord with the application for insurance is in the nature of a counteroffer that must be accepted by the applicant in order to constitute a binding contract.").

The power of acceptance for a renewal contract thus lies in the insured. *See Richmond v. Travelers' Ins. Co.*, 123 Tenn. 307, 310, 130 S.W. 790, 790 (1910) ("The letter of September 2d, written by the agents ... containing the renewal receipt, simply amounted to an offer on the part of the company to renew the insurance for the ensuing six months. This was, of course, open to the acceptance or rejection of [the insured]."); 1 *New Appleman on Insurance* § 3.07[1], at 3–54 ("[T]he insurer is considered to make an offer of a renewal policy, which the insured can accept or reject."). If the insured fails to accept an offer to renew, or rejects the offer, there is no contract. *See Richmond v. Travelers' Ins. Co.*, 123 Tenn. at 317, 130 S.W. at 792 (holding that there was no contract because the insured failed to accept the offer of renewal).

As Judge Crownover noted over seventy-five years ago,

> The issuance of a policy with terms different from those of the application is a counter proposition, which if accepted by the insured becomes a binding contract subject to all its terms. It becomes a binding contract in the absence of fraud or mistake, and the insured is presumed to have agreed to all its terms.

*Woodfin v. Neal*, 16 Tenn.App. at 488, 65 S.W.2d at 216 (citations omitted); *see also*

*National Life & Accident Ins. Co. v. Carmichael,* 53 Tenn.App. 280, 286, 381 S.W.2d 925, 928 (1964) (quoting 2 A.L.R.2d 943). As one prominent treatise explains,

> Where the insured receives a policy not conforming exactly to the one desired, he or she may either accept it or reject it. But if he [or she] desires to reject it, he [or she] must act within a reasonable time, so that his [or her] retention of the policy beyond a reasonable time will not be taken as an acceptance of it.

3 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 14.6, at 236 (2d ed.1998). An insured therefore has a duty to read his or her policy and is conclusively presumed to have full knowledge of its contents.[16] *See Kiser v. Wolfe,* 353 S.W.3d 741, 749 (Tenn.2011); *Webber v. State Farm Mut. Auto. Ins. Co.,* 49 S.W.3d 265, 274 (Tenn.2001); 1 *New Appleman on Insurance Law* § 3.01[1][c], at 3–14; *see also* 1A *Couch on Insurance* § 16:1, at 16–4 ("Opportunity to ratify or waive any inconsistent provisions, or to accept the form of policy delivered, as well as actual acceptance of the altered contract, is essential to the making of a valid contract on the basis of the nonconforming policy." (footnotes omitted)).

This is a logical and fair requirement because:

> insureds are often in the best position to verify that the essential policy terms are what they expected, that they conform with their application and intent, and that the policy conforms with the representations about coverage by the agent. This rule also is designed to identify any clerical errors in the policy and to ensure that the insurer has not issued a counteroffer. (footnotes omitted)

1 *New Appleman on Insurance Law* § 3.01[1][c], at 3–14.

The Court has determined that Ms. Smith was legally the agent of Allstate and that she mistakenly moved the insurance coverage on the 2002 Chrysler minivan from Mr. Tarrant's commercial insurance policy to his personal insurance policy. Even if both of these statements are true, the Court's conclusion that Allstate must provide coverage for the 2002 Chrysler minivan under Mr. Tarrant's commercial policy is inconsistent with basic contract principles.

There are three ways to view the negotiations between Allstate and Mr. Tarrant. First, Mr. Tarrant's request for a change in coverage could be considered to be his offer to purchase insurance at a reduced premium. In this context, the policy changes issued by Allstate constitute both a rejection of Mr. Tarrant's offer and a counteroffer. Second, the coverage Allstate proposed in response to Mr. Tarrant's inquiry about reducing his premiums could be viewed as an offer from Allstate. *See* 1 *New Appleman on Insurance* § 3.01[1][f], at 3–23. Third, Allstate's initial renewal notice could be construed as an offer from Allstate which Mr. Tarrant rejected when he made a counteroffer requesting that all the "vans" be insured under this commercial policy. Allstate's issuance of the policy changes would then amount to a rejection of Mr. Tarrant's counteroffer and a new counteroffer by Allstate. Each of these views inescapably leads to the conclusion that the power of acceptance was always in Mr. Tarrant's hands.

There can be little dispute that Mr. Tarrant had a reasonable time either to dispute the terms of his replacement insur-

---

**16.** This view is shared by many other states. *See, e.g., McHoney v. German Ins. Co.,* 52 Mo.App. 94, 96–98 (1892); *Phillis Dev. Co. v. Commercial Standard Ins. Co.,* 457 P.2d 558, 559 (Okla.1969); *Bostwick v. Mutual Life Ins. Co. of N.Y.,* 116 Wis. 392, 89 N.W. 538, 540–41 (1902).

ance coverage as reflected in the amended policy declarations or to decide to accept the coverage that the replacement policy declarations provided. Had Mr. Tarrant disputed the coverage provided in the amended declarations, this dispute would have amounted to a rejection of the terms of the new policies, and the parties could have entered into a new insurance agreement on other mutually acceptable terms.

Mr. Tarrant does not dispute that he received four bills and at least one amended policy declaration after he requested changes in his coverage. The letter accompanying the amended policy declaration clearly asked him to review the new policies and to communicate with Allstate "right away" if "anything isn't exactly right." [17] This letter also succinctly stated:

> The accompanying Amended Policy Declarations includes these changes:
>
> The addition of your 03 Dodge Trk Dr3500 2wd.
>
> The addition of your 95 Lexus Es300.
>
> A change in insurance coverage for your 02 Chrysler Town–Country.
>
> A change in description for your 02 Chrysler Town—Country. The addition of the passive restraint discount 02 Chrysler Town—Country.
>
> The deletion of one or more operators.
>
> Your premium for the current policy period has been increased by a total of $573.26.

The amended policy declaration itself included a cover page displaying the covered vehicles, including the 2002 Town & Country, as well as the premium adjustments. Following the cover page was an individual page for each vehicle, including the 2002 Town & Country, which clearly showed the liability limits for the 2002 Town & Country were limited to $100,000/$300,000/$100,000.

Despite receiving ample notice of the changes in his replacement coverage, Mr. Tarrant did not take issue with either policy. He simply paid the premiums when they came due and continued to pay these premiums until he traded in the 2002 Chrysler minivan. Well-settled law provides that there are many ways for an insured to manifest intent to accept a insurance coverage, *see* 2 *Couch on Insurance Law* § 29:18, at 29–40, and particularly that "[a]cceptance may also be found in the insured's retention of the renewal policy without objection." 2 *Couch on Insurance Law* § 29:18, at 29–41 to –42 (noting that paying premiums for nearly a year before objecting to the terms of the policy establishes acceptance of the policy). Clearly, Mr. Tarrant objectively manifested his intent to accept the replacement coverage and thereby, in the trial court's words, "ratified" [18] the insur-

**17.** More specifically, the letter stated: "We've sent along this mailing to verify the changes to your policy that you recently requested. The changes took effect on 04/04/05. Please look over all the information in this mailing and call us right away if you have any questions or if anything isn't exactly right."

**18.** Both the Court of Appeals and this Court consider the trial court's use of the term "ratify" to be profoundly significant. I view this term as not much more than a red herring. In the context in which the trial court used the term, it is clear that the trial court believed that Mr. Tarrant had accepted the terms of Allstate's replacement insurance coverage. Even if the trial court's use of the word "ratify" reflected its reliance on some other legal principle, it is well-neigh inescapable that the trial court reached the correct result. It is always a reviewing court's prerogative to affirm a trial court's decision on grounds different from those relied upon by the lower court when the lower court has reached the correct result. *State v. Hester*, 324 S.W.3d 1, 21 n. 9 (Tenn.2010); *Continental Cas. Co. v. Smith*, 720 S.W.2d 48, 50 (Tenn.1986); *Hopkins v. Hopkins*, 572 S.W.2d 639, 641 (Tenn.1978).

ance coverage by paying the premiums in the months leading up to the accident and indeed, almost a year beyond the accident without objection. Consequently, I would affirm the trial court's conclusion that Mr. Tarrant is bound by the terms of the replacement coverage, as reflected in the Amended Auto Policy Declarations and other materials that Allstate sent to him.[19]

Chief Justice CLARK has authorized me to state that she concurs in this opinion.

---

**19.** Although this Court has not universally required an insured to read his or her policy in a renewal case, this is not a typical renewal case where the insured may expect to receive an identical policy with only a change in premium. In this case, Mr. Tarrant was negotiating for broad coverage changes and, as an experienced businessman, he should have read the replacement declarations pages to make sure that they provided the coverage he desired, just as Allstate's letter requested him to do.